UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CONNIE BROWN, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| vs. | ) No. 1:14-cv-00921-JMS-TAB |
| | ) |
| INDIANA UNIVERSITY HEALTH BALL | ) |
| MEMORIAL HOSPITAL, INC., | ) |
| | ) |
| *Defendant*. | ) |

## ORDER

Presently pending before the Court is Defendant Indiana University Health Ball Memorial Hospital, Inc.'s ("Ball Memorial") Motion for Summary Judgment. [Filing No. 30.] Ball Memorial asks for summary judgment on Plaintiff Connie Brown's Fair Labor Standards Act ("FLSA") claim, in which Ms. Brown alleges that Ball Memorial violated the FLSA by failing to pay her for overtime. [Filing No. 30; Filing No. 28-1 (Plaintiff's Statement of Claims).] Ms. Brown opposes Ball Memorial's motion. [Filing No. 35.] For the following reasons, the Court grants Ball Memorial's Motion for Summary Judgment. [Filing No. 30.]

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the

materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P.

56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

**II.**
**RELEVANT BACKGROUND**

The following facts are either undisputed or construed in a light most favorable to Ms. Brown, the non-movant; in fact, many of them are taken from Ms. Brown's deposition in this case. [Filing No. 32-1 to Filing No. 32-4; Filing No. 36-1.]

The Committee on Trauma of the American College of Surgeons ("ACS") promotes the development of trauma centers that provide the spectrum of care to address the needs of injured patients at all stages. [Filing No. 32-6 at 3.] ACS provides a verification process for trauma centers, and "ACS verification requires a high level of coordination between hospital departments to care for injured patients, including personnel and policies to stabilize and provide primary treatment to any injured patient." [Filing No. 32-6 at 3.] ACS trauma verification impacts which trauma patients are sent to Ball Memorial's emergency department and how it is compensated for those patients. [Filing No. 32-6 at 3.] The ACS has a "Green Book" that "contains guidance for establishing a trauma program, including guidance for establishing a trauma registry." [Filing No. 32-6 at 3.]

Ball Memorial is a tertiary referral center and teaching hospital in East Central Indiana. [Filing No. 32-6 at 2.] Ms. Brown began working at Ball Memorial in 1989. [Filing No. 32-1 at 6.] She was a trained EMT at that time, and worked in various capacities in the emergency department. [Filing No. 32-1 at 7-8.] In 2011, Ms. Brown applied for and received a Trauma

3

Registrar position at Ball Memorial, effective January 1, 2012. Trauma Registrar was a salaried position, and Ms. Brown was paid the same amount regardless of the number of hours she worked. [Filing No. 32-2 at 9; Filing No. 32-4 at 15.] Ms. Brown was a Trauma Registrar at Ball Memorial until her employment was terminated on January 27, 2014. [Filing No. 32-4 at 20.] At issue in this litigation is whether Ms. Brown was entitled to overtime pay pursuant to the FLSA for her work as a Trauma Registrar.

Several months before applying for the Trauma Registrar position, Ms. Brown attended an educational trauma registrar certification course in St. Louis. [Filing No. 32-1 at 23-24.] Ms. Brown also was introduced to the National Trauma Data Base through trauma programs at other IU Health facilities and received Trauma Quality Improvement Program training in Chicago. [Filing No. 32-1 at 26-28.] Ms. Brown was familiar with ICD-9 coding, CPT coding, trauma scoring, injury severity scoring, and Glasgow coma scores. [Filing No. 32-1 at 32.] She was also part of the IU Heath Trauma Committee. [Filing No. 32-1 at 34.]

In 2010 or 2011, Ball Memorial was in the process of seeking ACS verification as a Level III Trauma Center. [Filing No. 32-6 at 2; Filing No. 32-1 at 20.] Ball Memorial's Emergency Medical Services Manager and Emergency Preparedness Coordinator, William Gossett, asked Ms. Brown if she would consider applying for the Trauma Registrar position to help build the hospital's trauma program. [Filing No. 32-6 at 2; Filing No. 32-1 at 9-10.] Ball Memorial did not have a trauma program at that time, and Mr. Gossett asked Ms. Brown to help him "build the program from the ground up." [Filing No. 32-1 at 10 (Ms. Brown's testimony); *see also* Filing No. 32-6 at 3 (Mr. Gossett's affidavit).] The "whole goal of the program was to provide the best trauma care for that patient." [Filing No. 32-3 at 14.]

The Trauma Registrar job description summarized the position as follows:

> **Summary**
> This position is accountable for prioritizing and coordinating the activities for the Trauma Registry in order to meet schedules and deadlines, maintain current and accurate procedures and practices. The incumbent performs a variety of functions to support the collection and coordination of Trauma Performance Improvement statistics with emphasis on data entry into a comprehensive computerized management system. The incumbent acts as a liaison with the Trauma Program Manager, Medical Director(s) and trauma staff to provide reports on a scheduled and ad hoc basis. The incumbent collects trauma data for injury research and prevention, as well as quality improvement tracking and assures accuracy and confidentiality in the handling of all Trauma Registry related matters and is concerned with and active in the improvement of Trauma Program within the facility. All duties must be accomplished in a manner that is consistent with the Mission and Philosophy of the the organization. This position will report to the Trauma Program Manager.

[Filing No. 32-6 at 10.]  The job description detailed categories of "essential functions," including database management/support, customer service, registry reporting, data abstraction, and training. [Filing No. 32-6 at 10-11.]  Ms. Brown testified that the job description summary of the Trauma Registrar position was not accurate because "there were a lot more expanded roles that [she] did that are not described."  [Filing No. 32-2 at 28.]  She further testified that although it may actually describe the "role once the program is built," that was not the only role Ms. Brown had.  [Filing No. 32-2 at 29.]

Ms. Brown applied for the Trauma Registrar job online and stated in her application that her goal was "to be an integral part of leading [Ball Memorial] to the [ACS] Trauma Certification." [Filing No. 32-5 at 5.]  She indicated her desire to "build the Trauma Database from the ground up, ensuring data is appropriately collected and reported."  [Filing No. 32-1 at 11-13; Filing No. 32-5 at 5.]

Ms. Brown's job as a Trauma Registrar had multiple components, including process improvement, injury prevention, and community outreach.  For the process improvement component, Ms. Brown worked extensively with the ACS "Green Book."  She testified that the "Green Book" had "very specific expectations of what is required to build a quality [trauma]

5

program." [Filing No. 32-1 at 19.] According to Ms. Brown, the "Green Book" had "everything from your registry to processes to requirements of a trauma program manager, a trauma medical director, what is expected from each of the ancillary departments, from each of the medical departments, anyone who touches their trauma patient." [Filing No. 32-1 at 19.] Ms. Brown knew what type of information to gather from traumas based on the "Green Book," which she testified was "pretty standardized." [Filing No. 32-3 at 16-17.] She "erred on having more rather than less data" and then entered the data points that ACS considers from the "Green Book." [Filing No. 32-3 at 17.] Mr. Gossett had "the final word" with regards to Ball Memorial's trauma registry. [Filing No. 36-1 at 5.]

Members of the IU Health Trauma Committee, which included Ms. Brown and Mr. Gossett, would meet to discuss "[a]nything trauma related" and to work through the "Green Book" "to ensure our processes were in place, any questions we had, any explanations that we needed." [Filing No. 32-1 at 35.] Ms. Brown testified that "with the green book, there are very specific requirements. Some of those requirements have some interpretation issues where different people interpret the meaning of them differently, and we would discuss those and then try to tailor the requirements to fit our individual facilities." [Filing No. 32-2 at 2.] The IU Health Trauma Committee would also review cases "where there were different coders [who] had different ideas of what severity of injuries, how they were coded, and then we would go back and review and look up through our resources other information and then come back collectively and discuss them at the next meeting and see if we can all agree on exactly what the appropriate answer would be." [Filing No. 32-2 at 6-7.] Ms. Brown testified that although the "Green Book" had "very specific rules to coding trauma," there was "[a]bsolutely . . . enough nuance to require review." [Filing

6

No. 32-2 at 7.] If the "Green Book" did address something in a specific way, however, Ms. Brown had no authority to decide not to follow it. [Filing No. 32-4 at 29.]

In the beginning as a Trauma Registrar, Ms. Brown met with Mr. Gossett frequently every day to discuss "the entire program" since "all of the policies had to be built, all of the processes had to be built, all of the education had to be built, contacts with all of the departments had to be built and all of those relationships." [Filing No. 32-2 at 22.] Mr. Gossett trusted Ms. Brown with portions of all of the development of Ball Memorial's trauma program. [Filing No. 32-2 at 22.] She put policies together and "anything that was needed for the trauma program [she] was involved in some level on." [Filing No. 32-2 at 23.] Ms. Brown did not, however, have the authority to implement the policies on her own. [Filing No. 32-4 at 29.] Ms. Brown worked from templates other hospitals used and tailored them to the needs of Ball Memorial. [Filing No. 32-2 at 24.] Ms. Brown confirmed that Mr. Gossett relied on her "to take the initiative to determine what was needed for the education and training that [she] needed to have" to perform her job. [Filing No. 32-2 at 26.] Ms. Ball also coordinated education required for other staff members in the trauma program, and once she got approval from Mr. Gossett she would just "run with it" and "facilitate all of that." [Filing No. 32-2 at 27.] Ms. Brown was involved in the decision regarding what kind of trauma registry software Ball Memorial would select. [Filing No. 32-3 at 6-7.]

The process improvement portion of Ms. Brown's Trauma Registry job was "part of every day." [Filing No. 32-3 at 11.] She would review the trauma patient's chart and documentation and make all of the entries into the Ball Memorial trauma registry. [Filing No. 32-3 at 10-11.] She would occasionally speak with physicians or surgeons if she needed clarification on something within the chart. [Filing No. 32-3 at 11.] Ms. Brown also was involved in group meetings regarding the development of flowcharts for emergency room trauma patients at Ball Memorial,

7

and she "contribute[d] thoughts from the trauma registrar's perspective" because what was originally used did not have all of the information she needed. [Filing No. 32-3 at 20.]

Ms. Brown's job as a Trauma Registrar also had an "injury prevention piece" because ACS requires trauma programs "to show that you are working in your community to prevent injuries." [Filing No. 32-2 at 31.] To do that, Ms. Brown "headed the Delaware County Safe Kids coalition and met with a group associated with that from the community." [Filing No. 32-2 at 31.] She facilitated a lot of events for injury prevention regarding bicycle helmet safety and car seat safety, as well as some regarding railroad safety, factory safety, and drunk driver prevention. [Filing No. 32-2 at 31-32.] She "did not have to propose those" programs to Mr. Gossett; instead, Ms. Brown coordinated those programs herself. [Filing No. 32-2 at 32.] She participated in approximately eight to ten of these events per month in the warmer months and fewer in the colder months. [Filing No. 32-2 at 33.] Ms. Brown was quoted in the media on behalf of Ball Memorial at one of the events she coordinated. [Filing No. 32-6 at 24.]

Ms. Brown's job as a Trauma Registrar also included "ordering for whatever needed to be ordered and facilitat[ing] that as far as equipment or supplies from whatever department." [Filing No. 32-3 at 4.] She also prepared for an ACS consultation site visit to Ball Memorial in June 2013. [Filing No. 32-3 at 5; Filing No. 32-3 at 22-23.] She spent multiple hours preparing each day for the weeks leading up to that visit because "they came to do a consultation visit to tell us what was still needed, our strengths and weaknesses so that when they came back to do the actual verification the hope would be that we were totally ready and [certification] went through without any deficiencies." [Filing No. 32-3 at 23-24.] Ms. Brown interacted with the ACS representatives and attended a dinner with them as well as the exit interview where strengths and weaknesses of the trauma program were discussed. [Filing No. 32-3 at 27-29.]

Ms. Brown testified that she "took over" the process improvement role of Ball Memorial's trauma program "the whole time" she was the Trauma Registrar. [Filing No. 32-3 at 27; Filing No. 32-3 at 32.] She testified that while that is not necessarily the way the position should function, that is what she did. [Filing No. 32-3 at 32.]

Ms. Brown testified that it was "[f]air to say" that every day on the job was different and that she "might not know coming into work on a given day exactly what [the] day would look like." [Filing No. 32-3 at 12.] Ms. Brown believed that "registrars make or break the whole trauma program." [Filing No. 32-3 at 13.] She had no staff and with "[w]hatever was trauma related," Mr. Gossett "depended on [her] to keep it moving." [Filing No. 32-3 at 35.] Mr. Gossett did not routinely review her work, and Ms. Brown testified that she "absolutely" had the discretion and decision-making authority to determine how she would perform the job. [Filing No. 32-3 at 35; Filing No. 32-4 at 2.] The entire time she was the Trauma Registrar, Ms. Brown was "in the process of developing the trauma registry," and at no time did she feel like she "had left that beginning stage of developing" it. [Filing No. 32-4 at 4-5.] Ms. Brown was part of the discussions at the system level to determine what types of cases to include in the trauma registry, [Filing No. 32-4 at 5-6], since the "Green Book" itself recognized that "[t]he exact inclusion and exclusion criteria used to select patients for entry into a trauma registry remains controversial[,]" [Filing No. 32-5 at 19]. As Trauma Registrar, Ms. Brown did not consult with anyone before putting a patient into the registry. [Filing No. 32-4 at 8.]

In June 2013, Bekah Dillon succeeded Mr. Gossett as Ms. Brown's supervisor before Ms. Brown left Ball Memorial. [Filing No. 32-4 at 9.] With Ms. Dillon as her supervisor, Ms. Brown no longer did the process improvement piece of the Trauma Registrar position. [Filing No. 32-4 at 10.] If Ms. Brown saw issues in the way that data was being entered into the registry, she would

9

raise the issue with Ms. Dillon and that "was still an important part" of Ms. Brown's position. [Filing No. 32-4 at 11.] Ms. Brown did not attend as many meetings once Ms. Dillon became her supervisor. [Filing No. 32-4 at 11-12.] Ms. Brown believed that Ms. Dillon's expectation of her was that she "find the appropriate patients and enter the data, [and] concentrate on the registry and the trauma registrar role" as opposed to the "expanded roles" Ms. Brown was doing when Mr. Gossett was her supervisor. [Filing No. 32-4 at 12-13.] Ms. Brown did not work outside of the facility when Ms. Dillon was her supervisor and is not sure that she did any of the injury prevention events during that time. [Filing No. 32-4 at 21-22.]

Ms. Brown did not work from sometime in August 2013 to sometime in December 2013 due to an illness. [Filing No. 32-4 at 20.] She was terminated on January 27, 2014. [Filing No. 32-4 at 20.] ACS certified Ball Memorial's Trauma Center as a Level III Trauma Center in May 2014. [Filing No. 32-8 at 5.]

Ms. Brown estimates that during most of her time as the Trauma Registrar she typically worked 60 hours per week, although she did not clock in and out and did not specifically keep track of her time. [Filing No. 32-4 at 17; Filing No. 32-4 at 21.] She testified that she had a good working relationship with Mr. Gossett and "[f]or the most part" had a good working relationship with Ms. Dillon. [Filing No. 32-4 at 26.]

Ms. Brown filed her Complaint against Ball Memorial in June 2014. [Filing No. 1.] Her operative complaint alleges that Ball Memorial violated the FLSA by classifying Ms. Brown as "exempt" from overtime pay. [Filing No. 11 at 2-4.] Ball Memorial now moves for summary judgment on Ms. Brown's claim. [Filing No. 30.]

## III.
### DISCUSSION

At issue in this litigation is whether Ms. Brown qualified for the administrative exemption to the FLSA's requirement that employees who work in excess of forty hours per week receive overtime pay. 29 U.S.C. § 207 (maximum hours provision); 29 U.S.C. § 213(a)(1) (administrative exemption). Ball Memorial contends that there is no genuine issue of material fact that Ms. Brown qualifies for the administrative exemption. [Filing No. 31 at 14-20.] Ball Memorial emphasizes evidence showing that Ms. Brown exercised discretion and independent judgment with respect to matters of significance and that her primary duty was directly related to Ball Memorial's general business operations. [Filing No. 31 at 15-20.] For these reasons, Ball Memorial asks that summary judgment be entered in its favor. [Filing No. 31.]

In response, Ms. Brown disputes Ball Memorial's characterization of her job. [Filing No. 35.] She emphasizes the data entry component of the job and contends that she lacked authority to make independent choices because "[a]ll such data extraction and coding is fully dictated by the Green Book." [Filing No. 35 at 5.] Ms. Brown argues that she did not have the authority to implement policies and procedures and that her supervisors had the final say on policy implementation and her other activities. [Filing No. 35 at 5-6.] Ms. Brown concludes that summary judgment in favor of Ball Memorial is inappropriate because genuine issues of material fact exist regarding whether the administrative exemption of the FLSA's overtime pay requirement applied to her—namely, the nature of her primary duties, the amount of discretion she had in performing those duties, and her ability to exercise independent judgment. [Filing No. 35 at 6.]

In reply, Ball Memorial points out various facts that Ms. Brown did not dispute, which it contends are sufficient to show that she had discretion and could exercise independent judgment in her job. [Filing No. 39 at 2.] It emphasizes that even if the "Green Book" provided rules with

11

regard to coding, "[Ms.] Brown still had to determine *how* to fulfill the requirements of the Green Book." [Filing No. 39 at 3 (original emphasis).] Ball Memorial cites Ms. Brown's deposition testimony as undisputed evidence that she had discretion, could exercise independent judgment, and qualified for the administrative exemption to the FLSA's overtime pay requirement. [Filing No. 39 at 4.]

Under the FLSA, employees are entitled to overtime pay—*i.e.*, one and one-half times the employee's regular rate—for any hours worked in excess of forty hours per week, unless a statutory exemption applies. 29 U.S.C. § 207. "The burden is on the employer to establish that an employee is covered by [an] exemption." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 571 (7th Cir. 2012). Because it is a "remedial statute," exemptions are "narrowly drawn against the employers" and are "limited to those establishments plainly and unmistakably within their terms and spirit." *Id.* (citations omitted).

The FLSA sets forth an overtime pay exemption for "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Determining whether the administrative exemption applies "requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose*, 679 F.3d at 572. The following regulation has been promulgated with regard to the administrative exemption:

> a) The term "employee employed in a bona fide administrative capacity" . . . shall mean any employee:
>
> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

12

> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

*Schaefer-LaRose*, 679 F.3d at 572 (citing 29 C.F.R. § 541.200(a)).

Ms. Brown concedes that the first two elements of the administrative exemption applied to her position as Trauma Registrar at Ball Memorial. [Filing No. 35 at 4 (citing Filing No. 28-1 at 2 (Ms. Brown's statement of claims)).] Ms. Brown disputes, however, whether the third element of the administrative exemption applied—specifically, whether her "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." *Schaefer-LaRose*, 679 F.3d at 572 (citing 29 C.F.R. § 541.200(a)).

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). A proper analysis rests on the plaintiff's "day-to-day duties . . . not merely the parties' characterization of those duties as involving discretion or not." *Schaefer-LaRose*, 679 F.3d at 580.

The applicable regulation provides a list of factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(b). The Seventh Circuit Court of Appeals has emphasized that the listed factors are "not a checklist" and that "the determination of discretion is a circumstance-specific one that will look different from industry to industry and position to position." *Schaefer-*

*LaRose*, 679 F.3d at 582 (referencing 29 C.F.R. § 541.202(b)). The relevant portion of the regulation provides the following factors to consider:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.200(b).

In her response to Ball Memorial's motion for summary judgment, Ms. Brown collectively analyzes her job duties during her entire time as a Trauma Registrar. [Filing No. 35.] In other words, Ms. Brown does not parse her duties under Mr. Gossett's supervision from her duties under Ms. Dillon's supervision. The Court will follow suit and collectively analyze Ms. Brown's duties during her time as a Trauma Registrar. *See Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. . . . Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.") (quotation omitted).

Even viewing the evidence of record in the light most favorable to Ms. Brown, as it is required to do on summary judgment, the Court concludes that there is no genuine dispute of material fact that Ms. Brown's work as Trauma Registrar at Ball Memorial is exempt from the overtime requirement of the FLSA pursuant to the administrative exemption. Ms. Brown's

deposition testimony confirms that she played an integral role in building Ball Memorial's trauma program from the ground up, with the goal of achieving ACS certification for Ball Memorial as a Level III Trauma Center. As detailed at length in the background set forth above, it is beyond dispute that Ms. Brown had extensive responsibilities as Trauma Registrar that required her to utilize her discretion and independent judgment with respect to matters of significance. Ms. Brown's response brief ignores the entire injury prevention component of her job and does not attempt to dispute the discretion and independent judgment she exercised as the voice of Ball Memorial in facilitating various community outreach programs as part of the ACS certification process. [*See, e.g.*, Filing No. 32-6 at 24 (news article regarding the Safe Kids outreach with Ms. Brown commenting on behalf of Ball Memorial).]

As for the process improvement component of her job, Ms. Brown was intimately involved in helping develop policies and procedures to build Ball Memorial's trauma registry program from the ground up. She frequently attended meetings and at times was the voice of the trauma registry program as workflow and protocol were developed. Ms. Brown tailored templates to Ball Memorial's program and made all of the entries into the trauma registry. While her response to Ball Memorial's summary judgment motion emphasizes the "very specific standards" set forth in the ACS "Green Book," [Filing No. 35 at 5-6], Ms. Brown ignores the discretion and independent judgment she utilized regarding how to apply the "Green Book" to the development and implementation of the trauma center at Ball Memorial. In fact, Ms. Brown confirmed at her deposition that while she "absolutely" had the discretion and decision-making authority to determine how she would perform her job. [Filing No. 32-3 at 35; Filing No. 32-4 at 2.] Ms. Brown's attempt to recast her main duties as only related to data entry fails because her job duties included so much more than that.

For these reasons, the Court concludes that Ms. Brown's testimony removes any genuine dispute as to any material fact regarding the application of the administrative exemption of the FLSA overtime requirement to her position of Trauma Registrar at Ball Memorial. Therefore, Ball Memorial is entitled to summary judgment on Ms. Brown's FLSA claim.

## IV.
### CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendant's Motion for Summary Judgment. [Filing No. 30.] Final judgment shall issue accordingly.

Date:  October 19, 2015

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via CM/ECF:**

Rebecca L. Loeffler
KILEY HARKER & CERTAIN
rloeffler@khclegal.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
bonnie.martin@odnss.com